# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

NATALIE PRATHER, Special Administrator )
of the Estate of Billy Jo Johnson, deceased, )
                                                                     Plaintiff, )
v.    )
                                                  )  Case No. 6:23-cv-187-JAR
SHERIFF OF PONTOTOC COUNTY, )
in his official capacity, )
                                                Defendant. )

## OPINION AND ORDER

This is a civil rights action initiated pursuant to 42 U.S.C. § 1983 by plaintiff Natalie Prather as Special Administrator of the Estate of Billy Jo Johnson, deceased, based on alleged violations of the Eighth Amendment to the United States Constitution during decedent's incarceration at Pontotoc County Justice Center ("PCJC") in Ada, Oklahoma. Before the court is the motion for summary judgment [Doc. 127][1] filed on behalf of defendant Sheriff of Pontotoc County, in his official capacity, pursuant to Fed. R. Civ. P. 56(a). Plaintiff timely responded in opposition [Doc. 136] and the Sheriff filed a reply brief [Doc. 148]. Upon leave of court, plaintiff filed a surresponse [Doc. 155] and the Sheriff filed a surreply [Doc. 156].

### I.    UNDSIPUTED MATERIAL FACTS

This case arises from the death of Billy Jo Johnson, which resulted from an inmate-on-inmate assault at PCJC on December 14, 2020. Unless otherwise noted,

---

[1] For clarity and consistency herein, when the court cites to the record, it uses the pagination and document numbers provided by CM/ECF.

the following facts are undisputed for summary judgment purposes.

### A.   PCJC POLICIES AND PROCEDURES

Defendant John Christian served as the Sheriff of Pontotoc County from January 2009 to January 2025. As Sheriff, he was ultimately responsible for the operation of PCJC. [Doc. 127 at 9, ¶¶ 1-2; Doc. 136 at 12, ¶¶ 1-2].

#### 1.   Appointments and Delegation of Authority

Pursuant to Policy 1-09, the Sheriff is required to appoint a jail administrator and delegate to that individual the authority to oversee, plan, and manage operations of PCJC. [Doc. 127-3]. At the time of the incident at bar, the jail administrator was Victoria Bramlett. [Doc. 127 at 9, ¶ 3; Doc. 136 at 12, ¶ 3]. Michael Sinnett—who served as the jail administrator from 2011 to early 2020 and from February 2021 to September 2022—testified that his duties included training jail staff and assisting the Sheriff in drafting PCJC policies and procedures. [Doc. 127-2 at 33 (120:2-7)].

#### 2.   Jail Facilities and Staff Training

The segregation unit at PCJC, designated as "E-Pod," confines male inmates placed in administrative segregation, protective custody, or disciplinary confinement. [Doc. 127-6 at 1-3 (Policy 20-02)]. Inmates housed in E-Pod may spend up to one hour outdoors per day, excluding weekends and weather permitting, unless restricted by safety or security concerns. They are additionally permitted to shave and shower no fewer than three times per week. Outside of these allowances, segregated inmates remain confined to their cells within E-Pod. [*Id*. at 4]. PCJC also enforces a practice of restricting use of the E-Pod dayroom to a single inmate at any given time, unless

two inmates are assigned to the same cell. In such instances, cellmates may access the dayroom together. All jail staff, whether new or seasoned, receive training on this practice. [Doc. 127 at 10, ¶ 6; Doc. 136 at 12, ¶ 6].

The PCJC control tower provides an elevated vantage point over seven housing pods, including E-Pod, as well as the adjacent exercise yard. [Doc. 127-9; Doc. 127-11; Doc. 127-19]. Inside the tower, multiple surveillance monitors display live feeds from cameras positioned throughout each pod, within each cell, across the exercise the yard, and along connecting hallways. [Doc. 127-10 at 7-8 (59:17-60:25); Doc. 127-7 at 3-4 (5:12-6:14)]. Detention officers use these monitors to control inmate and staff movement by remotely locking and unlocking cells, pods, and hallway doors. [Doc. 127-7 at 3-4 (5:12-6:6); Doc. 127-9].

Before releasing an inmate from his cell, the on-duty officer must conduct a thorough inspection of E-Pod to ensure no other inmates are present. PCJC trains all detention officers on this inspection process, which includes: reviewing the two cameras providing full visibility of E-Pod; enlarging and examining the surveillance feed to confirm the dayroom is empty; and physically inspecting the area by standing from the monitor desk, crossing the tower floor, and observing the E-Pod dayroom through the tower windows. [Doc. 127 at 10, ¶¶ 8-9; Doc. 136 at 12, ¶¶ 8-9]. PCJC also trains detention officers on how to respond when two or more inmates are improperly present in the E-Pod dayroom. Absent an emergency,[2] the on-duty officer

---

[2] According to former jail administrator Michael Sinnett, an "emergency" arises where two inmates with a known history of conflict are simultaneously present in the dayroom, or when a physical altercation erupts. [Doc. 127-2 at 17-18 (91:15-92:3), 19 (93:14-19), 25 (110:3-24)].

must first instruct the inmates via the tower intercom to return to their cells. If the inmates refuse to comply, the officer is required to radio for assistance to forcibly return them to their cells. [Doc. 136-1 at 5 (17:1-9); Doc. 136-3 at 5 (17:2-10); Doc. 136-4 at 18 (68:23-69:6)].

New PCJC detention officers receive training not only on formal and informal jail policies but also on the Oklahoma Jail Standards ("OJS"). [Doc. 127 at 11, ¶ 12; Doc. 136 at 12, ¶ 12].[3] According to OJS 310:670-5-3, facilities housing seventy-five inmates or more must have one dispatcher or control center operator and a minimum of two detention officers on the premises at all times. [Doc. 137-4 at 11].

## B. THE FATAL INMATE-ON-INMATE ASSAULT

On December 14, 2020, Billy Jo Johnson—who had been transferred to PCJC in September 2020 on a drug court violation hold—was housed in E-Pod pursuant to his request for protective custody. [Doc. 127-14; Doc. 136-1 at 5 (14:2-12)]. Kalup Allen Born—who was in jail for the suspected murder of an elderly woman—was also housed in E-Pod on administrative confinement.[4] [Doc. 136-2 at 26 (32:5-10); Doc. 136-3 at 5 (15:24-16:14); Doc. 136-4 at 15 (54:25-55:5)]. Johnson and Born were previously housed in the same non-segregated unit, known as "G-Pod," and interacted frequently without issue. [Doc. 127 at 14, ¶¶ 28-29; Doc. 136 at 13, ¶¶ 28-29].

---

[3] James Smith, who served as a detention officer during the events at issue, testified that his initial training largely consisted of shadowing other officers and observing daily operations from the control tower. [Doc. 136-1 at 4 (10:17-22), 6 (20:9-17), 8 (29:14-17)].

[4] Policy 20-02 defines "administrative confinement" as the "[s]eparation of an inmate from the general population when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly operation of the facility." [Doc. 127-6 at 1]. Plaintiff's expert, Scott DeFoe, testified that Born was transferred to E-Pod after threatening jail staff. [Doc. 136-2 at 26 (32:5-10)].

4

On the date in question, the 5:00 a.m. to 5:00 p.m. shift included: (1) Jail Administrator Victoria Bramlett; (2) Detention Officer ("DO") Terry Pinley; (3) DO James Smith; (4) Kitchen Supervisor and DO Beth Wingate; (5) DO Kenny Fowler; and (6) Evelyn Fowler, a nurse employed by a third-party contractor. Neither Administrator Bramlett nor DO Fowler were present at PCJC on the morning of December 14, however.[5] Although DO Smith attempted to call in sick that morning due to a possible sinus infection, he ultimately complied with Administrator Bramlett's request that he work his normal scheduled shift in the control tower. [Doc. 127 at 12, ¶¶ 15-16; Doc. 136 at 12, ¶¶ 15-16].

At around 8:18 a.m., DO Smith released Billy Jo Johnson from his E-Pod cell for scheduled recreational time. [Doc. 127-12 at 0:00:00 (12-14-2020 E-Pod Dayroom Surveillance Footage)]. An hour later, Smith instructed Johnson to return to his cell several times, but decedent did not comply. [*Id*. at 0:50:02-0:51:08; Doc. 126-1 at 9 (30:8-15); Doc. 127-17 at 5 (7:18-22)]. At 9:25:27, while Johnson was still on the dayroom floor, Smith granted Kalup Born's request to be released from his E-Pod cell. [Doc. 127-12 at 0:56:31; Doc. 126-17 at 5 (7:22-24)]. As Johnson was walking from the shower to his cell at 9:26:28, Born approached and knocked him to the concrete floor with punches to the chest and head. [Doc. 127-12 at 0:57:23-057:33]. Smith immediately radioed for backup. [Doc. 127-8 at 15 (46:16-21); Doc. 127-25].[6] Born stomped on Johnson's head for nearly a minute before voluntarily returning to his

---

[5] Administrator Bramlett was at a doctor's appointment for cancer treatment and DO Fowler was transporting an inmate to the courthouse. [Doc. 127 at 14, ¶ 32; Doc. 136 at 13, ¶ 32].

[6] **One minute and one second** elapsed between when DO Smith released Born from his cell (9:25:27 a.m.) and when Smith radioed for backup (9:26:28 a.m.).

cell at 9:27:57. [Doc. 127-12 at 0:57:36-0:58:33, 0:58:48-0:59:02]. DO Wingate, DO Pinley, and Nurse Fowler entered E-Pod at 9:28:08 to find Johnson face down on the floor bleeding heavily from his head. [*Id*. at 0:59:12-0:59:36; Doc. 127-21; Doc. 127-24].[7] Smith called 911 at 9:31:22; EMS arrived at 9:40:22 and departed with Johnson at 10:22:30. [Doc. 127-23 at 1].

DO Smith testified that he "thought Billy Jo was locked back down" before releasing Born from his cell but could not recall whether he checked the surveillance monitor before doing so. [Doc. 136-1 at 9 (32:22-33:9), 10 (34:17-19)]. In his incident report, Smith stated that he noticed when Johnson and Born were in dayroom together before the assault. [*Id*. at 12 (45:16-19)]. According to Sheriff Christian, Smith should have immediately ordered Born and Johnson back to their cells when he observed both inmates in the dayroom. [Doc. 136-3 at 7 (25:14-16)]. The Sheriff further stated that when it was obvious the two inmates were not complying, Smith should have immediately radioed for backup. [*Id*. at 8 (26:18-20)]. Smith believes that he did order the two inmates to lockdown but could not recall at what point he did so. [Doc. 136-1 at 13 (46:22-47:14)].

### III.    PERTINENT PROCEDURAL HISTORY

Plaintiff commenced this action in the District Court of Pontotoc County, Oklahoma on August 1, 2022. In the operative version of her complaint, plaintiff asserts a § 1983 claim against Sheriff Christian in his official capacity based on allegations that he was deliberately indifferent to the safety and security of inmates,

---

[7] **One minute and forty seconds** elapsed from the time Born's attack began (9:26:28 a.m.) to the moment detention officers arrived in E-Pod (9:28:08 a.m.).

including Billy Jo Johnson by failing to (i) adopt or enforce policies to protect inmates, (ii) sufficiently staff PCJC, and (iii) adequately train jail staff, including DO Smith. [Doc. 2-19]. Plaintiff seeks relief in the form of actual, compensatory, and punitive damages. The Sheriff removed this action to the United States District Court for the Eastern District of Oklahoma on June 7, 2023, pursuant to 28 U.S.C. § 1331. [Doc. 2]. By virtue of the express consent of the parties [Doc. 42], and in accordance with Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned U.S. Magistrate Judge exercises complete jurisdiction over this action through and including trial and the entry of a final judgment.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At the summary judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Tolan v. Cotton, 572 U.S. 650, 656 (2014) (*quoting* Anderson, 477 U.S. at 249). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" Id. (*quoting* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Insu. Co., Ltd. v Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

## V.    DISCUSSION

Plaintiff claims that Sheriff Christian is liable under 42 U.S.C. § 1983 in his official capacity for failing to protect Billy Jo Johnson, in violation of the Eighth Amendment. This species of claim "represent[s] only another way of pleading an action against an entity of which an officer is an agent." <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 690 n. 55 (1978); <u>Martinez v. Beggs</u>, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [plaintiff] brings a claim against [the sheriff] in his official capacity, it is the same as bringing a suit against the county.").

A local governmental unit such as a municipality or a county, though a "person" for purposes of § 1983, "may not be held liable under § 1983 solely because it employs a tortfeasor." <u>Bryan Cty. v. Brown</u> ("<u>Brown</u>"), 520 U.S. 397, 403 (1997). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Monell</u>, 436 U.S. at 694. A plaintiff suing a sheriff under § 1983 for the acts of a jailer must prove: (1) that the jailer committed a constitutional violation, and (2) that a jail policy or custom was the moving force behind the constitutional deprivation. <u>Myers v. Okla. Cty. Bd. of Cty. Comm'rs</u>, 151 F.3d 1313, 1316 (10th Cir. 1998) (*citing* <u>Monell</u>, 436 U.S. at 684). In this case, both elements are at issue.

### A. ALLEGED CONSTITUTIONAL VIOLATION

Although the Eighth Amendment applies only after an adjudication of guilt and does not apply directly to pretrial detainees like Billy Jo Johnson, the Supreme Court and the Tenth Circuit have nevertheless held that the Eighth Amendment's protections apply to pretrial detainees through the Due Process Clause of the Fourteenth Amendment. *See* Bell v. Wolfish, 441 U.S. 520, 535-37 (1979); Garcia v. Salt Lake City, 768 F.2d 303, 307 (10th Cir. 1985); Barrie v. Grand Cty., Utah, 119 F.3d 862, 867 (10th Cir. 1997). If plaintiff can establish a violation of decedent's Eighth Amendment rights, she can establish a violation of his Fourteenth Amendment rights as a pretrial detainee.

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on prison officials to "provide humane conditions of confinement," including "taking reasonable measures to guarantee the safety of inmates." Hooks v. Atoki, 983 F.3d 1193, 1205 (10th Cir. 2020) (*quoting* Farmer v. Brennan, 511 U.S. 825, 833 (1994)). This overarching obligation includes a duty "to protect prisoners from violence at the hands of other prisoners. " Id. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Rather, a prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must objectively be "sufficiently serious" and (2) the defendant's state of mind must subjectively have been one of "deliberate indifference" to inmate safety. Id.

### 1. Sufficiently Serious Deprivation

The objective component is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishments Clause." Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005) (*quoting* Farmer, 511 U.S. at 834). The undisputed harm suffered by Billy Jo Johnson—death by inmate-on-inmate assault—is itself sufficient to satisfy the objective prong. *See* Martinez, 463 F.3d at 1088 (holding that "death [is], without doubt, sufficiently serious to meet the objective component.").

### 2. Sufficiently Culpable State of Mind

Turning to the subjective component, plaintiff must present evidence that a jailer, such as DO Smith, (1) knew of a substantial risk of serious harm and (2) disregarded that risk by failing to take reasonable measures to abate it. *See* Farmer, 511 U.S. at 837; Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998). It is not sufficient to show that he "should have perceived" the risk; deliberate indifference requires actual awareness, not mere negligence. Farmer, 511 U.S. at 838; Whitley v. Albers, 475 U.S. 312, 319 (1986). Whether a jailer had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. Farmer, 511 U.S. at 842.

To satisfy this component, plaintiff relies primarily on the testimony of DO Smith concerning PCJC's practice of generally prohibiting simultaneous inmate presence in the E-Pod dayroom. She emphasizes that Smith acknowledged the segregation unit housed both protective-custody inmates like Johnson, and inmates

under administrative confinement like Born. [Doc. 136 at 25-26]. She then argues it is "totally irrelevant whether Smith had any reason to suspect that Born in particular represented any special risk to Johnson." [*Id.* at 30]. It is undisputed these two inmates were previously housed together in a non-segregated PCJC unit without incident. Plaintiff's theory, then, rests on the premise that Born's segregation status alone should have alerted Smith to a substantial risk of harm. Although some administratively confined inmates may present heightened risks to protective-custody inmates, the law does recognize administrative segregation as inherently dangerous. To impose liability based solely on inmate classification would be to adopt a strict liability regime that the Eighth Amendment does not permit.

Plaintiff also points to Smith's acknowledgment that jail policy generally prohibited simultaneous inmate presence in the E-Pod dayroom. [*Id.* at 25-26]. She argues that Smith acted with deliberate indifference by (i) purportedly failing to check the monitor before releasing Born from his cell, and (ii) failing to radio for backup until the attack began. [*Id.* at 26-27, 29]. According to plaintiff, Smith's failure to follow internal procedures amounts to "obduracy and wantonness." [*Id.* at 31 (*citing* Whitley, 475 U.S. at 319)]. But the mere existence of these procedures does not establish that simultaneous inmate presence posed a known, substantial risk of harm. A jailer's failure to comply with an internal policy that imposes a standard of care higher than that required by the Eighth Amendment cannot, by itself, establish deliberate indifference. *See* Porro v. Barnes, 624 F.3d 1322, 1330 (10th Cir. 2010); Barney, 143 F.3d at 1310-11.

While conceding "[n]o one claims that Smith intended for Born to brutally beat Johnson to death," plaintiff maintains that Smith's "mistake" is no defense. [*Id.* at 32]. She asserts that Smith's duty to ensure only one inmate was in the dayroom at a time was so "clear and unambiguous that mere negligence cannot account for [his] omission." [*Id.*]. This argument, however, conflates internal policy standards with constitutional requirements. Both the Supreme Court and Tenth Circuit have consistently distinguished negligence and even gross negligence from the recklessness required for a constitutional violation. *See e.g.,* Farmer, 511 U.S. at 835; Whitley, 475 U.S. at 1084 ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."); Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003); Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006).[8]

At most, the record reflects an isolated lapse by a single detention officer who mistakenly believed an inmate had returned to his cell before releasing another inmate into a common area. Such conduct, while tragic in its consequences, does not constitute the subjective recklessness required under *Farmer*. Because plaintiff offers no evidence from which a reasonable jury could conclude that DO Smith knew of and disregarded a substantial risk to decedent's safety, the subjective component is not satisfied. Sheriff Christian is therefore entitled to summary judgment, as he may not

---

[8] *See also* Rasho v. Jeffreys, 22 F.4th 703, 710 (7th Cir. 2022) ([A] single negligent act cannot support an inference of deliberate indifference[.]"); Brooks v. Celeste, 39 F.3d 125, 129 (6th Cir. 1994) ("Repeatedly violating an objective standard of reasonableness does not necessarily mean that the official acted with 'deliberate indifference' as defined in *Farmer*. The official may be incompetent, but he is not acting wantonly, and thus is not inflicting 'punishment.'").

be held liable under § 1983 in his official capacity where there is no underlying constitutional violation by any of his officers. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

### B. ALLEGED POLICY OR CUSTOM

Even if plaintiff could prove an underlying constitutional violation, she cannot show that a PCJC policy or custom was the moving force behind the injury alleged. *See* Mocek v. City of Albuquerque, 813 F.3d 912, 933 (10th Cir. 2015) (*quoting* Brown, 520 U.S. at 404) ("[A] plaintiff asserting a § 1983 claim must show … a direct causal link between the policy or custom and the injury alleged. Through its 'deliberate conduct,' the municipality must have been the 'moving force' behind the injury."). As outlined by the Tenth Circuit, "[a]n official policy or custom may take many forms, including 'a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision.'" Blueberry v. Comanche Cty. Facilities Auth., 672 Fed. Appx. 814, 816 (10th Cir. 2016) (*quoting* Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 770 (10th Cir. 2013)).

#### 1. Failure to Adopt or Enforce Policies / Understaffing

Plaintiff's first official-capacity theory asserts that Sheriff Christian is liable for the death of Billy Jo Johnson because PCJC failed to adopt or enforce policies to protect inmates from assault and allegedly assigned an undertrained, medicated, and inexperienced detention officer to the control tower while short-staffed. [Doc. 136 at 34-37]. She describes the "key to Defendant's liability" as Administrator Bramlett's

13

decision to require DO Smith to work his normal shift on December 14, 2020, despite having called in sick with a sinus infection. [*Id.* at 36]. Plaintiff's surresponse reframes this same theory as one of inadequate staffing, asserting that "[w]ith proper staffing, this incident could have been prevented." [Doc. 155 at 6].

Even crediting plaintiff's characterization of these events, her theory does not establish a triable issue under <u>Monell</u> and its progeny. To impose § 1983 liability on a municipality (or a sheriff in his official capacity), a plaintiff must demonstrate that a policy or custom caused the alleged constitutional violation. <u>Monell</u>, 436 U.S. at 694; <u>City of Okla. City v. Tuttle</u> ("<u>Tuttle</u>"), 471 U.S. 808, 821 (1985). An isolated or "random" personnel decision is insufficient; municipal liability requires proof of a formal policy or a persistent and widespread practice amounting to a custom. <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988); <u>Hinton</u>, 997 F.2d at 782.

Here, plaintiff presents no evidence of a PCJC policy or custom requiring sick officers to report for duty. The record shows that DO Smith was assigned to his regular shift and did not request reassignment from the tower, express discomfort with his duties, or refuse to work. [Doc. 136-1 at 11 (38:17-23), 16 (58:15-59:3)]. Smith also testified that he had previously worked alone in the tower and that the position is generally a one-person job. [*Id.* at 6 (20:24-21:5)]. Although plaintiff alleges that Smith was "medicated" and "less than fully alert," the undisputed evidence shows he was prescribed steroids and antibiotics for a sinus infection and did not take any medication that impaired his ability to perform his duties. [Doc. 127-8 at 8 (24:3-14), 23 (59:22-25)].

Plaintiff further fails to identify a policy of chronic understaffing. Both parties acknowledge that staffing decisions are made jointly by the Sheriff and Jail Administrator. [Doc. 155 at 6; Doc. 156 at 6]. Under Policy 1-09, the Jail Administrator oversees day-to-day operations. [Doc. 127-3]. The record establishes that three detention officers were on duty for a short period on the morning of December 14, 2020, which met the minimum staffing levels required under OJS 310:670-5-3. Plaintiff cites testimony from DO Pinley suggesting a preference for four officers, but Pinley was not the policymaker, and his opinion does not establish the existence of a policy or custom. [Doc. 136-4 at 17 (63:24-64:25)].

At its essence, plaintiff's "failure to adopt or enforce policy" theory seeks to impose vicarious liability for a single, tragic incident rather than identify a deliberate or conscious choice attributable to the Sheriff.[9] There is no evidence of prior similar incidents, repeated policy breaches, or a pattern of requiring impaired officers to staff critical jail posts. Asking Smith to work his regular shift, even if he was mildly ill, is at most an isolated personnel decision or a "normally random act" insufficient to create an official-capacity claim. Murphy v. Bitsoih, 320 F.Supp.2d 1174, 1196 (D.N.M. 2004) (*citing* Praprotnik, 485 U.S. at 131).

Plaintiff's attempt to repackage this theory as "inadequate staffing" also fails under *Monell*. The undisputed facts establish that Administrator Bramlett scheduled

---

[9] While plaintiff accurately observes that "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference," [Doc. 155 at 4 (*citing* Tafoya v. Salazar, 516 F.3d 912, 919 (10th Cir. 2008))], that case involved a sheriff's repeated disregard of a longstanding pattern of policy violations by multiple detention officers. Here, plaintiff alleges one lapse by one detention officer without any pattern or history of non-enforcement to attribute to the Sheriff.

three detention officers for a brief portion of the December 14 shift, meeting the regulatory minimum. There is no evidence that PCJC routinely operated below safe levels or that the Sheriff consciously disregarded a known and pervasive staffing problem. Indeed, one-time personnel decisions and isolated mistakes do not amount to a policy or custom. Id. (*citing* Praprotnik, 485 U.S. at 131).

Accordingly, plaintiff has not presented evidence from which a reasonable jury could conclude that Sheriff Christian maintained a policy, custom, or deliberate practice of either (i) forcing unfit officers to work or (ii) chronically understaffing the jail. Nor has she shown that any such practice was the moving force behind Johnson's death. Summary judgment is therefore warranted on plaintiff's "failure to adopt or enforce polices" and "failure to adequately staff" theories.

### 2. Failure to Adequately Train Jail Staff

Plaintiff also suggests that Sheriff Christian is liable for Johnson's death because he failed to adequately train detention officers, including DO Smith. Although plaintiff's operative complaint does not expressly allege a failure-to-train claim, she raised the theory in her response and surresponse to the Sheriff's summary judgment motion. [Doc. 136 at 37-39; Doc. 155 at 6-9]. Sheriff Christian objects to the belated introduction of this claim, noting that a party may not amend its pleadings through a summary judgment response. Even assuming the court considers this theory on the merits, it does not survive summary judgment.

A municipality, or a sheriff in his official capacity, may be liable under § 1983 for failure to train only where the inadequacy of training "amounts to deliberate

16

indifference to the rights of persons with whom the [employees] come into contact." City of Canton v. Harris ("Canton"), 489 U.S. 378, 388 (1989). In considering this theory, the court is mindful of the Supreme Court's warning that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011) (*citing* Tuttle, 471 U.S. at 822-233). To satisfy the stringent deliberate indifference standard, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'" because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. at 62 (*quoting* Brown, 520 U.S. at 409). Evidence of "a pre-existing pattern of violations" is only unnecessary "'in a narrow range of circumstances,'" however rare, in which "the unconstitutional consequences of a failure to train" are "'highly predicable'" and "patently obvious." Id. at 63-64.

Plaintiff's failure-to-train theory rests primarily on the testimony of DO Smith and her expert, Scott DeFoe. Smith testified that he received predominately on-the-job training. [Doc. 136-1 at 8 (29:14-17)]. While Smith stated that he might have called for backup more quickly if formal training had emphasized the danger of two inmates being in the segregation dayroom simultaneously [*Id*. at 14 (50:3-51:14)], he also stated he felt comfortable working the tower by himself and believed he been sufficiently trained to handle the situation that occurred between Born and Johnson [*Id*. at 16 (58:19-59:3)]. Conversely, DeFoe opined that Smith was not properly

17

trained to perform tower-control duties and that Smith's inadequate preparation contributed to Johnson's death. [Doc. 136-2 at 13 (51:24-52:9)]. Plaintiff also cites the absence of training logs and formal evaluations as evidence that PCJC's training practices were lax.

These facts, taken as true, do not create a triable issue of deliberate indifference. To start, plaintiff identifies no pattern of similar constitutional violations suggesting that the Sheriff was on notice that existing training was inadequate. *See* Connick, 563 U.S. at 61; Brown, 520 U.S. at 407. It is undisputed that an incident like this—two inmates in the E-Pod dayroom resulting in a fatal assault—had never occurred before. [Doc. 136 at 37]. Without prior incidents, the Sheriff lacked actual or constructive knowledge that his training program posed a substantial risk of constitutional harm.

Next, plaintiff's reliance on a single-incident theory under *Canton* is unavailing. That narrow exception applies only when the need for specific training is "so obvious" that the failure to provide it constitutes a conscious choice to disregard a predictable constitutional violation. *See* Canton, 489 U.S. at 390 n.10 (arming police officers without instructing them on the constitutional limits of deadly force constitutes deliberate indifference). By contrast, Smith was trained on the segregation policy, understood that only one inmate should be out at a time, and acknowledged the importance of conducting visual checks to avoid simultaneous occupancy. His failure to detect Johnson in the dayroom and to immediately summon backup reflects, at most, human error or negligence rather than the product of a

training program so facially deficient that constitutional violations were a "highly predictable" consequence.

Plaintiff's expert testimony does not alter this conclusion. DeFoe's opinions are largely conclusory and do not establish a causal link between any identifiable deficiency in PCJC's training program and the alleged constitutional violation. A generalized assertion that Smith was "not properly trained" does not satisfy the requirement that a plaintiff identify a specific deficiency in the training program "closely related to the ultimate injury." Keith v. Koerner, 843 F.3d 833, 839 (10th Cir. 2016). Nor does post-incident speculation that additional or different training "would have made a difference" amount to evidence of deliberate indifference by Sheriff Christian.

Finally, the summary judgment record shows that Smith's conduct was an isolated lapse rather than the manifestation of a systemic training failure. The Sheriff and Jail Administrator maintained policies prohibiting simultaneous dayroom occupancy and provided orientation on segregation procedures, which had successfully prevented similar incidents for years. A single officer's failure to properly implement known procedures does not transform a tragic mistake into a constitutional violation attributable to the Sheriff under *Monell* and its progeny. Accordingly, plaintiff has failed to present evidence from which a reasonable jury could conclude that Sheriff Christian acted with deliberate indifference under a failure-to-train theory.

## VI. CONCLUSION

WHEREFORE, the Sheriff's motion for summary judgment [Doc. 127] is hereby **GRANTED**.

IT IS SO ORDERED on this 8th day of August, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE